UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>DR. STEPHEN LATMAN,<br>Defendant. | Civil Action No. |

## COMPLAINT

The United States of America, through the United States Attorney for the Eastern District of Pennsylvania, brings this civil action against Dr. Stephen Latman for contributing to Pennsylvania's unprecedented opioid addiction crisis. According to the most recent report published by the Drug Enforcement Administration (DEA) in Philadelphia, over 4,600 Pennsylvanians died from drug abuse in 2016 alone. Over the past several years, numerous Pennsylvanians have become addicted to one particular type of drug—opioid painkillers, including oxycodone. While physicians are entrusted to do no harm and put their patient's interest above all else, Dr. Latman instead fed opioid addiction in the Reading region and abused the privileges of his position by prescribing oxycodone and other opioids without a legitimate medical purpose and outside of generally accepted treatment principles. Nothing can undo the damage that Dr. Latman has caused in the community. But this lawsuit attempts to do justice by pursuing these claims for the abuse of his prescription-writing privileges.

In support thereof, the United States alleges as follows:

## PARTIES

1. Plaintiff is the United States of America.

2. Defendant Dr. Stephen Latman is a physician and board-certified orthopedic surgeon who resides in Wyomissing, Pennsylvania and operated the Reading Orthopedic Associates, Inc. medical practice at all times relevant to this complaint.

## JURISDICTION AND VENUE

3. This action is brought by the United States under the Controlled Substances Act, 21 U.S.C. §§ 829, 842.

4. This Court possesses subject matter jurisdiction under 21 U.S.C. § 842(c)(1)(A), 28 U.S.C. §§ 1331, 1345, and 1355.

5. This Court has personal jurisdiction over Defendant Latman because he resides in, is located in, transacted business in, and committed the acts at issue in this district.

6. Venue is proper under 28 U.S.C. §§ 1391 and 1395, as Defendant Latman resides in, is located in, transacted business in, and committed the acts at issue in this district.

## RULES FOR SCHEDULE II DRUG PRESCRIPTIONS

7. The Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, and its regulations govern prescription writing by practitioners for controlled substances. The CSA establishes strict guidelines "to ensure a sufficient supply for legitimate medical . . . purposes and to deter diversion of controlled substances to illegal purposes. The substances are regulated because of their potential for abuse and likelihood to cause dependence when abused and because of their serious and potentially unsafe nature if not used under proper circumstances." 75 Fed. Reg. 61613 (Oct. 6, 2010).

8. The Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, dictates how prescriptions drugs are categorized. Schedule II drugs are those that have a "high potential for

abuse" that "may lead to severe psychological or physical dependence," but have "a currently accepted medical use in treatment." 21 U.S.C. § 812(b)(2).

9. Pursuant to administrative action by the Drug Enforcement Administration, (i) oxycodone (with brand names including OxyContin and Roxicodone), (ii) oxycodone/acetaminophen (with brand names including Percocet and Endocet), (iii) hydrocodone bitartrate and acetaminophen (with brand names including Norco and Vicodin),[1] (iv) morphine sulfate (with brand names including MS-Contin), (v) oxymorphone (with brand names including Opana[2]), and (vi) tapentadol (with brand names including Nucynta) are categorized as Schedule II drugs. *See* 21 C.F.R. § 1308.12.

10. The CSA requires those who manufacture, distribute, or dispense controlled substances, including doctors who write prescriptions for those drugs, to obtain a registration from the DEA. 21 U.S.C. § 822(a). However, a registrant may only distribute or dispense a controlled substance as "authorized by their registration and in conformity with the other provisions of" the CSA. § 822(b). Dr. Latman had obtained a registration with the DEA and was subject to the CSA's requirements at all times relevant to this complaint. Dr. Latman's registration was no longer active by the middle of 2016.

---

[1] Hydrocodone combination products, such as Norco and Vicodin, were reclassified from Schedule III to Schedule II drugs effective October 6, 2014. 79 Fed. Reg. 49661 (Aug. 22, 2014).

[2] Opana extended release is no longer on the market, after the Food and Drug Administration requested its removal based on "data, which demonstrated a significant shift in the route of abuse of Opana ER from nasal to injection following the product's reformulation." FDA News Release, *FDA requests removal of Opana ER for risks related to abuse* (June 8, 2017), *available at* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

11. Unless dispensed directly, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency. 21 U.S.C. § 829(a).[3]

12. A prescription for purposes of the CSA is only effective if issued for a

> *legitimate medical purpose* by an individual practitioner *acting in the usual course of his professional practice*. . . . An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and . . . the person issuing [such a purported prescription], shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

21 C.F.R. § 1306.04(a) (emphasis added).

13. The responsibility for proper prescribing and dispensing of these drugs rests with the prescribing practitioner. *Id.*

## FACTUAL ALLEGATIONS

14. Dr. Stephen Latman is an experienced board-certified orthopedic surgeon. He has practiced medicine since at least 1969, and at all times relevant to this complaint he was a registrant with the DEA permitted to write prescriptions for Schedule II controlled substances, subject to the requirements of the CSA. For the time period relevant to this complaint, Dr. Latman practiced out of Reading Orthopedic Associates, Inc.

15. The Drug Enforcement Administration (DEA) conducted an investigation of Dr. Latman's prescribing, particularly with respect to opioids. The investigation revealed that, for the patients and the period of time alleged in this complaint, Dr. Latman improperly prescribed

---

[3] To the extent the hydrocodone or other products were categorized as Schedule III drugs during the time they were prescribed, the drug still required an effective written or oral prescription. 21 U.S.C. § 829(b).

4

Schedule II controlled substances, abused his DEA registration, and wrote opioid prescriptions with no legitimate medical purpose.

16. While Dr. Latman had a significant number of patients from 2014 through 2016, the three patients outlined below received approximately 343 prescriptions from Dr. Latman for approximately 123,660 pills of high-risk drugs over this brief period of time.

17. The prescriptions for these patients often included oxycodone in 30mg dosage form. That dosage is one of the most heavily abused and most lucrative oxycodone prescriptions on the black market, due to its immediate release resulting in an instant "high" for the user.

18. An independent expert review by Dr. Stephen Thomas, who reviewed the medical and pharmacy records of these patients, resulted in a finding that the prescriptions were highly dangerous, wholly inappropriate, and susceptible to illicit use, as outlined below.

19. DEA's investigation also revealed that Dr. Latman flagrantly engaged in this prescribing pattern despite an admonition letter from the state licensing board. On November 23, 2015, a prosecuting attorney from the Bureau of Professional and Occupational Affairs at the Pennsylvania Department of State sent a letter to Dr. Latman. The letter, which came after an inquiry into allegations that he "engaged in the improper prescribing of controlled substances," "call[ed] into question whether [his] conduct constituted" immoral or unprofessional conduct and resulted in a recommendation of "additional continuing medical education credits on the prescribing of controlled substances."

20. Despite this increased scrutiny, Dr. Latman continued with his inappropriate opioid prescribing practices, in violation of the CSA.

21. The United States focuses its allegations on the prescriptions and pills for three of his patients. These prescriptions were issued without any "legitimate medical purpose," outside

"the usual course of [] professional practice," and served to feed Pennsylvania's opioid addiction crisis.

### A. Patient A

22. One of Dr. Latman's patients was patient A.

23. Public reports indicate that patient A was arrested for, *inter alia*, possession with intent to deliver illicit opioid pills.

24. Despite this illicit activity, from 2014 through the beginning of 2016, Dr. Latman wrote approximately 162 prescriptions for drugs like oxycodone, hydrocodone bitartrate and acetaminophen, and morphine sulfate extended release for patient A. Those prescriptions averaged about 6 per month in 2014 and 2015.

25. Dr. Latman's prescriptions for patient A were written for an extraordinary sum of pills for the patient: approximately 45,000 pills of 30mg oxycodone; 11,160 pills of morphine sulfate extended release; 9,000 pills of hydrocodone bitartrate and acetaminophen; and 3,780 pills of 80mg oxycodone extended release.

26. If patient A actually consumed the pills, the patient would have needed to take an average of 86 of these pills a day.

27. Dr. Stephen Thomas, an independent pain management expert, conducted a comprehensive review of patient A's medical records. After identifying many troubling issues in the records, he concluded that the above prescriptions were not for a medically legitimate purpose, not in accordance with the accepted treatment principles of any responsible segment of the medical community, and constantly placed patient A's life at risk.

28. The review revealed that Dr. Latman's opioid prescriptions had no upper limit for patient A. Dr. Latman prescribed an extraordinary number of opioids. However, the medical record did not indicate any level of analgesia, nor any functional improvements for patient A.

29. While Dr. Latman did conduct some urine drug screens, they instead suggested that the patient was engaged in illicit behavior. For example, in April 2009, Dr. Latman conducted a urine drug screen that resulted in a negative finding for hydrocodone, even though Dr. Latman had been prescribing Norco, suggestive of diversion. Dr. Latman again conducted a urine drug screen in November 2009, with the same results. Despite these strong indicia of drug diversion, Dr. Latman continued to prescribe for opioids. Dr. Latman did not conduct the next urine drug screen until May 2015, which again resulted in a finding that one of the non-opioid prescriptions was not being used. With respect to the opioids, the lab issued a warning because of the levels reported being of concern.

30. Despite the incredible and increasingly overwhelming opioid prescriptions being written for patient A, the medical records indicate that the patient did not achieve functional improvements or relief from pain. Nonetheless, Dr. Latman continued to increase the prescriptions.

31. Dr. Thomas concluded that patient A's life was continuously at risk for the irresponsible prescriptions being written that lacked a legitimate medical purpose. There was no evidence of significant benefit for the patient, nor was there appropriate monitoring of the medication.

32. The 162 prescriptions written by Dr. Latman for patient A were therefore not issued for a legitimate medical purpose, were not prescribed in the usual course of professional practice, and were not medically necessary.

**B.     Patient B**

33. Another of Dr. Latman's patients was patient B.

34. From 2014 through the beginning of 2016, Dr. Latman wrote approximately 100 prescriptions for drugs like 30mg oxycodone, 15mg oxycodone, 80mg OxyContin, and 40mg

Opana extended release for patient B. Those prescriptions averaged almost 4 per month in 2014 and 2015.

35. Dr. Latman's prescriptions for patient B were written for approximately 21,000 pills of 30mg oxycodone; 7,800 pills of 15mg oxycodone; 6,000 pills of 80mg OxyContin; and 2,160 pills of 40mg Opana extended release.

36. If patient B actually consumed the pills, the patient would have needed to take approximately 43.5 of these pills a day.

37. Dr. Thomas's comprehensive review of patient B's medical records resulted in very similar findings to the prior review. He once again concluded that the prescriptions mentioned above were medically illegitimate, despite indications that the patient was potentially diverting the medications or misusing them.

38. For example, Dr. Thomas's review revealed that Dr. Latman wrote for these opioid prescriptions, while regularly prescribing for two potent benzodiazepines at the same time. He concluded that there was no possible legitimate medical indication for the dosing of patient B's opioids, particularly in conjunction with two high-dose benzodiazepines.

39. In another example, patient B's only urine drug screen in 2015 resulted in a finding that the patient was not taking the oxycodone as prescribed. Nonetheless, Dr. Latman continued to supply patient B with prescriptions for powerful opioids, including oxycodone.

40. With an initial injury that had healed, Dr. Thomas concluded that there was nothing in the medical records that suggested patient B required the doses of medication prescribed. The prescribing was not in accordance with accepted treatment principles of any responsible segment of the medical community. The prescriptions were extravagant, unnecessary, and dangerous.

41. The 100 prescriptions written by Dr. Latman for patient B were therefore not issued for a legitimate medical purpose, were not prescribed in the usual course of professional practice, and were not medically necessary.

**C.     Patient C**

42. Another of Dr. Latman's patients was patient C.

43. From 2014 through the beginning of 2016, Dr. Latman wrote approximately 81 prescriptions for drugs like 30mg oxycodone, 80mg OxyContin, and 100mg Nucynta for patient C. Those prescriptions averaged 3 per month in 2014 and 2015.

44. Dr. Latman's prescriptions for patient C were written for approximately 8,760 pills of 80mg OxyContin; 3,000 pills of 100mg Nucynta; and 4,320 pills of 30mg oxycodone.

45. If patient C actually consumed the pills, the patient would have needed to take an average of 19 of these pills a day in 2014 and 2015.

46. Dr. Thomas's comprehensive review of patient C's medical records again resulted in very similar findings. He concluded that the prescriptions mentioned above were not for a legitimate purpose, were not in accordance with the accepted treatment principles of any responsible segment of the medical community, and instead only served to feed patient C's addiction and possibly diversion.

47. With a history of continuously escalating the patient's opioid prescriptions without any significant benefit, and with a history of at least one urine drug screen with positive findings for illicit prescription pills and cocaine, Dr. Latman continued to prescribe for opioids.

48. In December 2015, another urine drug screen tested positive for methamphetamine and negative for tapentadol, despite his prescriptions for Nucynta. Still, Dr. Latman continued to prescribe opioids.

49. During the time period in question, Dr. Latman continued to write an extraordinary number of opioid prescriptions in the face of signs of diversion, illicit drug use, and reports from the patient that they resulted in no significant improvement.

50. The 81 prescriptions written by Dr. Latman were therefore not issued for a legitimate medical purpose, were not prescribed in the usual course of professional practice, and were not medically necessary.

## STATUTORY PROVISIONS

51. The Controlled Substances Act makes it unlawful for any person "who is subject to the requirements of part C to distribute or dispense a controlled substance in violation of section 829 of this title." 21 U.S.C. § 842(a)(1).

52. Dr. Latman was a person subject to the requirements of part C of the CSA, through the mandate of 21 U.S.C. § 822(a).

53. As discussed above, 21 U.S.C. § 829 generally prohibits dispensing a Schedule II controlled substance without a written prescription of a practitioner, and 21 C.F.R. § 1306.04(a) requires that prescription to be issued for a "legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[4]

54. Each time a physician violates §§ 829 and 842(a)(1), that person is "subject to a civil penalty of not more than" $25,000 for violations on or before November 2, 2015, and $64,820 for violations after November 2, 2015. 21 U.S.C. § 842(c)(1)(A); 28 C.F.R. § 85.5.

---

[4] To the extent the hydrocodone or other drugs were categorized as Schedule III drugs during the time they were prescribed, the drug still requires an effective written or oral prescription that complies with 21 C.F.R. § 1306.04(a). 21 U.S.C. § 829(b).

### COUNTS 1 THROUGH 343 – DEFENDANT STEPHEN LATMAN
### Violations of the Controlled Substances Act
### (21 U.S.C. §§ 842(a)(1), 829, 842(c)(1)(A))

55. The United States incorporates by reference paragraphs 1 through 54 as if fully set forth herein.

56. Defendant Stephen Latman was a physician subject to the requirements of part C of the CSA. 21 U.S.C. § 822(a).

57. As detailed above, Defendant Latman repeatedly dispensed or distributed Schedule II controlled substances to patients without an effective prescription, as required by 21 U.S.C. § 829(a) and 21 C.F.R. § 1306.04(a).

58. In particular, Defendant Latman repeatedly wrote prescriptions for Schedule II controlled substances that were not issued for a legitimate medical purpose in the usual course of his professional practice.

59. Because Defendant Latman dispensed or distributed a controlled substance in violation of § 829, he thereby violated § 842(a)(1) and is subject to the penalties of § 842(c)(1)(A).

60. The United States is therefore entitled to civil penalties under the CSA for each improper prescription, to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, the United States of America demands judgment against Defendant Stephen Latman as follows:

61. Judgment against Defendant Latman for civil penalties of $25,000 for violations on or before November 2, 2015, and $64,820 for violations after November 2, 2015, per violation as mandated by law, and post-judgment interest, costs, and other proper relief; and

62. For such other and further relief as the Court deems just and equitable.

Respectfully submitted,

LOUIS D. LAPPEN
United States Attorney

MARGARET L. HUTCHINSON
Assistant United States Attorney
Chief, Civil Division

CHARLENE KELLER FULLMER
Assistant United States Attorney
Deputy Chief, Civil Division

ANTHONY D. SCICCHITANO
Assistant United States Attorney
PA 208607
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8380
anthony.scicchitano@usdoj.gov

*Attorneys for the
United States of America*

Dated: 3/23/18

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

**DEFENDANTS**
Stephen Latman

(b) County of Residence of First Listed Plaintiff: Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Berks County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Anthony D. Scicchitano
U.S. Attorney's Office
615 Chestnut St., Ste. 1250, Philadelphia, PA 19106

Attorneys *(If Known)*
Jason L. Reimer, Esquire
Post & Schell, PC
17 North Second Street, 12 Floor, Harrisburg, PA 17101

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☒ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product Liability |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability |  | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise |  ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
|  |  | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General |  |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** |  |  |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application |  |  |
|  | ☐ 448 Education / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions |  |  |
|  | ☐ 555 Prison Condition |  |  |  |
|  | ☐ 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 U.S.C. § 842

Brief description of cause:
Violations of Civil Controlled Substances Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE _____    DOCKET NUMBER _____

DATE: 03/23/2018

SIGNATURE OF ATTORNEY OF RECORD
AUSA Anthony D. Scicchitano

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | |
| DR. STEPHEN LATMAN, | : | |
| Defendant. | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.   ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.   ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.   ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)   ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   (X)

| | | |
|---|---|---|
| March 23, 2018 | Anthony D. Scicchitano, AUSA | Plff, USA |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 861-8380 | (215) 861-8618 | anthony.scicchitano@usdoj.gov |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

# UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: c/o U.S. Attorney's Office, 615 Chestnut Street, Suite 1250, Philadelphia, PA 19106

Address of Defendant: 33 Hummingbird Road, Wyomissing, PA 19160

Place of Accident, Incident or Transaction: Reading, PA
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))  Yes ☐  No ✓

Does this case involve multidistrict litigation possibilities?  Yes ☐  No ✓

RELATED CASE, IF ANY:
Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐  No ✓

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐  No ✓

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes ☐  No ✓

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes ☐  No ✓

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. Federal Question Cases:
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ✓ All other Federal Question Cases
    (Please specify) Controlled Substances Act

B. Diversity Jurisdiction Cases:
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Anthony D. Scicchitano, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 03/23/2018   Anthony D. Scicchitano, AUSA   208607
                   Attorney-at-Law                Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 03/23/2018   Anthony D. Scicchitano, AUSA   208607
                   Attorney-at-Law                Attorney I.D.#

CIV. 609 (5/2012)